(202 P.3d 57)
No. 98,407

RICHARD W. LEE, INDIVIDUALLY, ON BEHALF OF THE HEIRS-AT-LAW OF MARY L. LEE, DECEASED, and AS SPECIAL ADMINISTRATOR OF THE ESTATE OF MARY L. LEE, DECEASED, *Appellees*, v. WADE L. FISCHER, M.D., *Appellant*.

Opinion filed February 27, 2009.

*Jerry D. Hawkins* and *Randy J. Troutt*, of Hite, Fanning, & Honeyman L.L.P., of Wichita, for appellant.

*Arden J. Bradshaw*, of Wichita, for appellees.

Before RULON, C.J., GREENE, J., and LARSON, S.J.

GREENE, J.: Wade L. Fischer, M.D., appeals a medical malpractice judgment of $735,182 against him taken by the heirs and special administrator of the estate of Mary L. Lee (collectively referred to as the Lee plaintiffs). Dr. Fischer argues there were multiple instruction errors entitling him to reversal and new trial. We disagree and affirm the judgment.

### Factual and Procedural Overview

Lee was a 79-year-old female diagnosed with severe mitral regurgitation in 2003. In order to alleviate the condition, she elected to undergo mitral valve replacement surgery to be performed by Fischer, a cardiothoracic surgeon. As a preliminary step in the surgery, the anesthesiologist for the surgery, Ernest McClellan, M.D., attempted to place a Swan-Ganz catheter into Lee's internal jugular vein. He encountered problems in the insertion, but it was disputed the extent to which McClellan discussed these problems with Fischer. In any event, with at least some knowledge that the

catheter was likely outside the vein, Fischer elected to proceed with the valve surgery rather than investigate and remedy the potential damaging affects of the misplaced catheter. Lee experienced major internal bleeding with related complications and died within days of the surgery.

The Lee plaintiffs brought suit for medical malpractice against both Fischer and McClellan, together with others, alleging that (1) they knew or should have known the catheter had perforated an innominate vein and caused a potential life-threatening hemorrhage, and (2) they were negligent in electing to continue with surgery without first diagnosing and repairing the perforation that ultimately caused Lee's death. McClellan settled with the Lee plaintiffs before trial, and other defendants were dismissed. The case proceeded to trial against Fischer and resulted in a jury verdict assessing 100% fault to Fischer and 0% fault to McClellan with total damages of $735,182.

Dr. Fischer appeals, arguing multiple instruction errors.

### *Standards of Review*

The standards for our review of jury instructions are well known.

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

A trial judge's obligation to instruct the jury on a party's theory of the case only arises if there is evidence to support that theory. *Natalini v. Little*, 278 Kan. 140, 146, 92 P.3d 567 (2004).

"Trial courts are not required to use PIK instructions, but it is strongly recommended because the instructions were developed in order to bring accuracy, clarity, and uniformity to jury instructions. Modifications or additions should only be made if the particular facts of a case require it. [Citation omitted.]" *State v. Hebert*, 277 Kan. 61, 87, 82 P.3d 470 (2004).

### *Did the District Court Err in Failing to Instruct on Fischer's Contention that McClellan Was at Fault in the Technique Used for Catheter Insertion?*

Fischer initially challenges the district court's refusal to instruct the jury on his contention that McClellan was at fault for his "[f]ailure to meet the standard of care in his technique of insertion of the internal jugular vein catheterization of Mrs. Lee." The Lee plaintiffs argue on appeal that any such claim of negligence was not supported by the evidence and was withdrawn by counsel for Fischer during opening statement and closing argument.

In refusing Fischer's proposed contention instruction, the district court's reasoning was reflected in these brief comments from the bench:

"In this particular case, as to the first contention, to me the evidence was that it was not negligence that caused the perforation. The manner of repair was the allegation and what the instruction was, in my opinion."

When this instruction issue was raised again in Fischer's motion for directed verdict, the district court further explained its reasoning as follows:

"What everybody argued when we started the case was it's not a deviation from standard of care to pierce a vein while trying to insert the catheter. Campbell said if the anesthesiologist didn't tell the surgeon what he knew about where the catheter was at, that would be a deviation. Dr. Fischer said he wasn't told. The anesthesiologist says he was told. Myers says that it's the anesthesiologist's business to do that. And once—to withdraw it and to inform the surgeon, it's the surgeon's responsibility. The only thing that does is put in a fact issue whether or not Dr. Fischer was told about the problems that were encountered trying to insert the Swan-Ganz catheter. We'll let the jury decide that issue as a matter of comparative fault."

We turn first to the Lee plaintiffs' argument that the claim of negligence embodied in the contention instruction was withdrawn, abandoned, or waived by counsel for Fischer in opening statement or closing argument. It is undisputed that the contention was included in the amended pretrial order, but the record reflects the following statements by Fischer's counsel during opening statement:

"Now, you're gonna find out and everyone agrees . . . where [the catheter] was placed was outside the vein and did poke through the wall of the vein. Dr. McClellan, I'm sure, is going to say that, I did that. *We're not gonna claim that that by itself was negligent.* In fact, contrary to what has been suggested by plaintiff's counsel, *Dr. Fischer's not going to say, in my opinion Dr. McClellan was below the standard of care in doing that.* Now, they are going to call an expert by the name of Dr. Campbell who's going to say just that, who's going to be critical of Dr. McClellan as well as Dr. Fischer. When the case is over, I'm gonna say to you you shouldn't believe him on anything, not on his beliefs about Dr. Fischer, not on his beliefs about Dr. McClellan." (Emphasis added.)

Fischer suggests that it would be unfair for us to examine closing argument for these purposes, because counsel was required to conform argument to the instructions. Although we might agree in principle, we note that closing argument not only abandoned this precise contention, but abandoned any contention that McClellan was negligent:

"Now, let me visit the rest of the time with you about the real issue in the case, which is not damages, it is fault. Question No. 1—Because if you heard the evidence the way I heard it, I think this is going to resolve the entire dispute in the case you've heard. Question 1: Does the jury find either person to whom fault may be assigned at fault in the case? And you're later told those people are Dr. McClellan and Dr. Fischer. And I'm gonna suggest the answer to that is no. . . .

"We don't want you to believe any of Dr. — Dr. Campbell. We don't want you to believe any of Dr. Campbell. . . . [W]hat you need to understand is the only evidence that Dr. McClellan's at fault came from Dr. Campbell, and his opinions we're gonna show aren't credible on that any more than they are on Dr. Fischer's actions so that you should not accept that, and you should not find anyone at fault, even Dr. McClellan. The answer to Question No. 1 should be 'No.' "

Thus, the precise legal issue framed on appeal is whether counsel's express withdrawal or abandonment of a theory of negligence against a party with whom negligence may be compared is binding on that party. We note at the outset that the mere failure to assert a theory of recovery does not provide a basis for judgment when the theory is supported by the evidence. See *Fireman's Fund American Insurance Companies v. Central Securities, Inc.*, 208 Kan. 263, 491 P.2d 914 (1971). Moreover, where there is any ambiguity in the words spoken by counsel, a party is entitled to the presumption that his counsel did not intend to make an admission that would be fatal to his case. See *Wilkerson v. Lawrence*, 193

Kan. 92, 391 P.2d 997 (1964). Where, as here, counsel has expressly and unequivocally withdrawn during opening statement a claim of negligence against a party with whom negligence may be compared, we hold that the trial court may properly deny a contention instruction on that claim despite preservation of the claim in the pretrial order and some evidence to support it at trial. See *Northington v. Northington*, 158 Kan. 641, 149 P.2d 622 (1944); *Moses v. Missouri Pac. Rld. Co.*, 138 Kan. 347, 26 P.2d 259 (1933).

We view this holding as consistent with the district court's authority to eliminate claims or defenses *sua sponte* by summary judgment at pretrial. See Parnacott, *A Practitioner's Guide to Summary Judgment, Part 1*, 67 J.K.B.A. 36, 38 (1998). We have affirmed such *sua sponte* partial or complete summary judgments where there has been a confession of judgment or a clear lack of dispute regarding remaining material facts. See, *e.g.*, *Phillips v. Carson*, 240 Kan. 462, 466, 473, 731 P.2d 820 (1987); *Green v. Kaesler-Allen Lumber Co.*, 197 Kan. 788, 789-90, 420 P.2d 1019 (1966). Just as this procedure expedites the handling of any remaining claims, the elimination of jury instructions on withdrawn or abandoned claims expedites and simplifies the task at hand for the jury.

Denying such a contention instruction under these circumstances is particularly warranted where it appears that counsel intentionally withdrew the claim for strategic reasons. Here, the principal if not sole evidence of McClellan's negligence in the insertion of the catheter was expected to come from plaintiff's expert, who would also testify to the negligence of Fischer. It appears that counsel for Fischer chose to challenge the general credibility of that expert; thus—for the sake of consistency—it also required withdrawal of any contention of negligence against McClellan. In fact, the strategic dilemma was fully disclosed to the jury during the closing argument of Fischer's counsel:

"Does the jury find either person to whom fault may be assigned at fault in the case? And you're later told those people are Dr. McClellan and Dr. Fischer. And I'm gonna suggest the answer to that is no. The only testimony by anybody that Dr. McClellan was at fault was Dr. Campbell, and plaintiff's in the situation of saying don't believe part of Dr. Campbell but believe the rest of Dr. Campbell.

Don't believe Dr. Campbell when he says Dr. McClellan was at fault, but do believe him when he says Dr. Fischer's at fault, and believe half of Dr. McClellan. We don't want you to believe any of Dr. Campbell. We don't want you to believe any of Dr. Campbell, not just half of him; and so even though under—for reasons you don't need to understand that don't make any difference as to who's claiming that he's at fault, what you do need to understand is the only evidence that Dr. McClellan's fault came from Dr. Campbell, and his opinions we're gonna show aren't credible on that any more than they are on Dr. Fischer's actions so that you should not accept that, and you should not find anyone at fault, even Dr. McClellan."

Where a party's strategic choices at trial have adverse consequences, we have refused to grant relief on appeal from those same choices. See *State v. Gray*, 235 Kan. 632, 635-36, 681 P.2d 669 (1984).

In addition to the express withdrawal of the contention, our review of the record reflects that the contention was not fully supported by the evidence. The parties disagree whether the contention was supported by testimony from plaintiff's expert, Dr. Robert Campbell. We quote all relevant portions of that testimony below:

"Q. Is a doctor automatically considered negligent if he perforates a vessel while placing a Swan-Ganz?

"A. No.

"Q. Is that a known complication?

"A. Yes.

. . . .

"Q. Could you tell the jury what you gave as far as your opinion with regard to Dr. McClellan?

"A. What I stated in my report was that when Mr. Pamatmat, who was the nurse anesthetist, and Dr. McClellan were putting these—this—this catheter in, if they indeed failed to notify Dr. Fischer of these difficulties, then they deviated from the standard of care. . . .

. . . .

"[T]here was a great question as to whether a plan had actually been developed between Dr. Fischer and Dr. McClellan, and what I said was that if no plan had ever been developed because Dr. McClellan had indeed not gone to Dr. Fischer to inform him, then that would be a deviation of the standard of care. Now, since that time I think I've pretty well, you know, formed my own decision that there was indeed a plan in place, but at the time that I wrote this report I didn't have some of the information that I do now. . . .

"Q. Weren't you critical of his technique in causing the injury?

"A. Oh, yeah, that's right. That's right. . . . What I wrote was, despite a feared extravascular placement of the catheter, no attempt at locating the catheter's position with a chest x-ray or fluoroscopy was made by the anesthesia team. In a normal, straightforward jugular cannulation neither ultrasound guidance nor x-ray confirmation of the catheter position are necessary to meet the standard of care. However, when health practitioners encounter great difficulty in catheter placement such as [here], then additional measures are necessary to meet the standard of care, thus Mr. Pamatmat and Dr. McClellan failed to meet the standard of care in their technique of insertion. Now, what we did—what we discussed at deposition, just so they know everything, is that indeed those additional measure though can include the plan that we just talked about that we will look for it at operation. . . .

"Q. You are still critical of Dr. McClellan in this case though, right? Aren't you?

"A. Yes, I haven't changed my opinion.

"Q. Feel like he fell below standard of care?

"A. Yeah, in the areas that I—that I said, except that I—I don't believe that he deviated from the standard of care in not developing a plan because I believe that there was a plan in place.

"Q. Which leaves other deviations that are still out there—

. . . .

"A. Right. Well, that would just be that if they—if they never told him about the problems they were having putting this catheter in, and he—you know, if he's out there for an hour and a half and doesn't know what's going on with his patient, that's a deviation of the standard of care. But it doesn't have anything to do with what happened.

"Q. Well, also you mentioned something about the technique, studies that were not done.

"A. Except that a plan is a part of those other measures that are available."

Dr. Fischer testified that he was not faulting McClellan for failure to tell him something; in fact, Fischer stated, "I don't believe I fault Dr. McClellan for anything." Although Fischer urges us to consider the testimony of defense expert, Dr. Jeff L. Myers, we note that Myers was clear to disclaim any opinion on deviations by the anesthesia team due to lack of requisite expertise.

Does this testimony support a contention instruction that McClellan deviated from the standard of care in the "technique of insertion of the internal jugular vein catheterization?" We think not. Despite some degree of ambiguity in the witness' testimony, we believe the testimony supports only a deviation from the standard of care *if* the anesthesia team failed to notify Fischer of the degree of the problem encountered during insertion *or* failed to

devise a plan to locate and remedy the problems of perforation. This evidence supported the contention instruction given by the district court, which stated in material part:

"[Fischer] claims that plaintiff's injuries and damages were the result of the negligence of Dr. Ernest L. McClellan, M.D., in the following respect:

1. Failure to notify Dr. Fischer of the difficulties in catheter insertion and to confer with him about alternate insertion techniques."

Although the testimony may have supported a broader contention, there was—in the end—no support for suggesting that McClellan deviated from the standard of care in the insertion itself. In fact, the only expert testifying on this issue never departed from his testimony that it is *not* considered negligence to perforate a vessel during the insertion of a Swan-Ganz catheter. Although Fischer suggests on appeal that common sense and other testimony supports the fact that the perforation itself was a contributing cause of Lee's death, this fails to support the desired contention instruction where it was never established that insertion technique deviated from the standard of care. We also note that to the extent Fischer now argues "common sense" supported the contention, the district court gave a "common knowledge" exception instruction that was never employed by counsel for this purpose during trial. Fischer also argues on appeal that the "common knowledge" exception was inapplicable; however, so his arguments on appeal are wholly inconsistent on this point.

The record fails to contain any clear evidence that McClellan deviated from the standard of care in the insertion of the catheter or in causing the perforation. The entire focus of the trial was on fault and consequences for decisions made *after* insertion and apparent vascular perforation. In this regard, we agree with the district court's conclusion to deny inclusion of a contention instruction claiming that McClellan was negligent in "technique of insertion." This contention was both withdrawn by counsel and unsupported by the evidence at trial. Fischer's first claim of error is rejected.

### Did the District Court Err in Refusing
### to Instruct the Jury on the "Best Judgment" Rule
### Contained in PIK Civil 3d 123.11?

Fischer next contends the district court erred in refusing a requested jury instruction based on PIK Civil 3d 123.11. The requested instruction stated:

"Where, under the usual practice of the profession of the defendant, Wade L. Fischer, M.D., different courses of treatment and diagnostic testing are available which might reasonably be used, the physician has a right to use his best judgment in the selection of the choice of treatment and testing.

"However, the selection must be consistent with the skill and care which other physicians practicing in the same field in the same or similar community would use in similar circumstances."

The Lee plaintiffs contend this instruction "was not factually applicable to the issues and evidence in this case." They argue that the jury found the actual course of treatment to be unreasonable, "so the requested instruction would not have applied in any event."

The district court concluded the instruction "was not applicable."

The PIK Committee's Notes on Use of this instruction provide as follows:

"Where there is a dispute as to which of two or more courses is to be pursued in administering treatment, this instruction should be used. PIK 3d 123.01 and/ or 123.12 must also be given, depending on the status of the health care provider as a specialist or nonspecialist."

Our appellate courts have approved the use of this instruction, but we have never concluded that the failure to include the instruction is reversible error. See, *e.g., Hibbert v. Ransdell,* 29 Kan. App. 2d 328, 334, 26 P.3d 721, *rev. denied* 272 Kan. 1418 (2001). As is apparent from the second paragraph of the requested instruction, the selection or choice of treatment must be consistent with the applicable standard of care; we view the instruction as having little if any determinative impact on a jury's view of the evidence because the ultimate determination remains a question of deviation from the standard of care. Our court has recently examined the history of the instruction and criticized the principal authority from which it is derived. See *LaShure v. Felts,* 40 Kan. App. 2d 1001, 197 P.3d

885 (2008). We must first examine the evidence to determine general applicability.

Fischer testified at trial that he did *not* have a choice under these circumstances; he believed that proceeding to locate and repair any damage from the misplaced catheter before repairing the valve would have imperiled his patient:

"I chose the path that I felt gave Mary the best chance to survive, and I felt that if I tried to do a trapdoor incision and repair that injury at that time that she would not have survived that, so I felt the safest thing to do that would give Mary the best chance of getting out of the operating room was to fix the valve first.

. . . .

"Q. So there really wasn't anything that kept you from doing that trapdoor sternotomy right in the beginning when you knew there was a risk of a perforation, was there?

"A. Yes, there was. There was my concern and my opinion that in attempting to do that at the outset would have resulted in her death for the reasons that I've previously described. You couldn't perform the trapdoor sternotomy without having to go on pump under the circumstances that May Lee found herself in and that I found her in, and so my only option, in my opinion, was to fix the heart first, and then after the heart was fixed, then be able to repair the injury that she had sustained."

The expert called by the defense, Dr. Jeff L. Myers, initially testified on direct examination that the procedures could be done in *either* order:

"Q. Now, with regard to the order, how you would proceed in a situation where you did not know for certain that a catheter had gone through the vein, but you were being cautious and kind of assuming it did, would the standard of care require that you do the vein repair first or look for the vein injury and see if it needs repair and do so, or would the standard of care allow you to do—or require you to do the mitral valve first?

"A. Well, again, it's difficult to define the standard of care for this injury and this scenario because it occurs so rarely . . . . So your question is should it have been done in the—in the reverse order?

"Q. Right. They're claiming it should have been done in the reverse order.

"A. No. It doesn't matter. It had to be repaired. It doesn't matter if you repair it at the beginning or at the end, but it has to be repaired before you leave the operating room. That's the only—

"Q. Would standard of care allow the doctor the flexibility to, in his judgment, do it at the beginning or do it at the end?

"A. Absolutely. In the absence—In the absence of obvious bleeding, there is no requirement to do it at the beginning of the case.

. . . .

"Q. Recognizing that then to be your opinion, would it have made any difference in this case if Dr. Fischer would have fixed the vein before fixing the heart?

"A. No."

Myers equivocated substantially, however, under cross-examination:

"Q. There is a significant difference in whether Dr. Fischer was informed that the catheter was not in the correct position or if it specifically was thought to be 'extravascular.' That about right?

"A. Right.

"Q. You stated that?

"A. Correct.

"Q. Okay. And as you sit here today that's still true, isn't it?

"A. Yeah, I think that's true. If the—If the—Because it puts you down two different pathways. If the catheter's in the vascular system you're potentially—you're fine. You have absolutely no obligation to go and search for it. *If it's outside the vascular system, you're now in a pathway that gives significant bleeding. You need to go look for that catheter as the course of the bleeding—the source of the bleeding.*" (Emphasis added.)

In the last analysis, if the jury believed that Fischer was told by McClellan that the catheter placement was "extravascular" or there was other reason to believe that severe bleeding was occurring due to that placement (and there was evidence of hypovolemia or low blood volume, together with low blood pressure and elevating pulse rate, before Lee was placed on pump), the Myers' testimony meant *there was no choice*: the catheter had to be located and any perforation repaired before the valve surgery. In contrast, Fischer also contended there was no real choice: he needed to repair the valve before addressing the misplaced catheter.

According to Myers, the only scenario that presented a true choice of treatment was if Fischer was *not* informed of "extravascular" catheter placement and/or had no reason to believe there was active bleeding. Thus, the jury was required to do some fact finding on the true circumstances at the moment of decision: (1) whether Fischer was informed the catheter misplacement was "extravascular"; (2) whether Fischer had reason to believe there was active bleeding before he proceeded with the valve surgery. Depending on how the jury resolved these factual issues, there may

or may not have been a true "best judgment" situation to make PIK Civil 3d 123.11 applicable.

We conclude that giving the instruction here could have been as confusing as it could have been helpful. If the "best judgment" instruction had been given and a defense verdict rendered, the Lee plaintiffs would undoubtedly have claimed error. Considering the entirety of the instructions given, the jury was fairly instructed on the law governing the case. It is clear to us that the jury did not accept Fischer's suggestion that he "had no choice" and it also rejected Myer's suggestion that Fischer could have proceeded in either order because they found that Fischer breached the applicable standard of care. The omission of the "best judgment" instruction under these circumstances was not error.

### Did the District Court Err in the Inclusion of Optional Language Regarding the "Common Knowledge" Exception to the Requirement of Expert Testimony?

Finally, Fischer argues that the district court erred in having included the optional language contained in PIK Civil 3d 123.10, regarding the "common knowledge" exception to the requirement of expert testimony to establish standard of care. At trial, Fischer objected to the inclusion of optional language on finding a deviation from the standard of care through expert testimony. The objection was:

"Whether they're expert issue[s] or a common knowledge issue is not something you want to say to the jury you decide if an expert's required or—and if you decide it isn't, then you can decide on your own. These are clearly expert issues and not common knowledge issues, so that the last paragraph you say language, 'If what was done or not done in the treatment of a patient is within the common, everyday knowledge of persons generally, such facts may be established from the general circumstances as shown by the evidence, which evidence may include testimony by persons other than experts.' This is not a case where it falls within the common knowledge of everyday knowledge and people without going to medical school, and by doing it this way you're saying if you think failing to perform a sternotomy with a trapdoor extension prior to withdrawal of the catheter is something that common knowledge says you just don't do, then you're entitled to make your own decision and not lay it on an expert."

Notwithstanding this objection, the district court concluded the standard of care instruction with the optional paragraph, which states:

"The above rule is limited to those matters clearly within the field of medical science. If what was done or not done in the treatment of a patient is within the common everyday knowledge of persons generally, such facts may be established from the general circumstances as shown by . . . persons other than experts."

The PIK Notes on Use for PIK Civil 3d 123.10 provide that this optional language "may be included when applicable to the evidence of a particular case." The Comment to PIK Civil 3d 123.10 provides:

"If, in a given case, the bad results are so pronounced as to be apparent to anyone, and if what was done or not done in the treatment of a patient is so obvious and within the common everyday knowledge of persons generally, such facts may be testified to by persons other than physicians."

The most common types of cases where lay testimony has been held sufficient to establish a prima facie case against a physician are cases in which the health care provider has left some foreign object in a patient's body. See, *e.g.*, *Capps v. Valk*, 189 Kan. 287, 369 P.2d 238 (1962).

This was clearly not a case where the optional language should have been given. The evidence was almost exclusively provided by specialists in cardiothoracic surgery, all of whom expressed opinions on the applicable standards of care under the circumstances. The appropriate course of action here was not "so obvious" as to be within the common everyday knowledge of persons generally, and the district court erred in including the optional language from PIK Civil 3d 123.10.

The more difficult question is whether the error requires that we reverse and remand for a new trial. Again, this question requires that we consider the entire set of instructions and determine whether they fairly instruct the jury on the law governing the case. We note that the subject instruction juxtaposed, just above the disputed paragraph, the following language from PIK Civil 3d 123.10:

"In determining whether a surgeon used the learning, skill and conduct required, you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge. On questions of medical or scientific nature concerning the standard of care of a physician only those qualified as experts are permitted to testify. The standard of care is established by members

of the same profession in the same or similar communities under like circumstances. It follows, therefore, that the only way you may properly find that standard is through evidence presented by these types of expert witnesses."

In assessing the question of prejudice, we note that the errant language was never referenced in closing argument. Counsel for the defense clearly emphasized the need to rely on expert testimony for the standard of care:

" '[Y]ou are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge.' None of us come from backgrounds that allow us to say, Oh, I think he should have done that mitral valve first. We don't. We don't have—nobody would call us up and say, Hey, what do you think we ought to do here? We don't know. We're not trained. It's a doctor's call. 'On questions of medical or scientific nature,' which is what these decisions that were made were, your—Let's see—the standard of care of a physician—'only those qualified as experts are permitted to testify.' Okay. So is he negligent? It's a scientific issue. We can't decide. We've got to look to the experts."

We recognize that counsel for the Lee plaintiffs asked the jury to "make the decision," but there was no emphasis on the errant language in the subject instruction, nor was there any suggestion that the expert's testimony should be ignored. In fact, counsel emphasized the importance of the expert's testimony by stating in rebuttal closing that "these experts are important. They've given you the setting, but they're not the show here. They're just part of the database for you. They're part of the facts for you, and you're the ones that are now equipped to make the decision." We do not view these statements as an invitation to ignore the expert testimony and substitute common knowledge on the standard of care.

Considering the instructions as a whole, they were substantially correct and fairly instructed the jury on the law governing this case. Clearly, the district court erred in including the optional common knowledge language from PIK Civil 3d 123.10 where the exclusive evidence on standard of care had been presented by experts, but the error was harmless under these circumstances.

Affirmed.