NOT DESIGNATED FOR PUBLICATION

No. 127,667

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

CORY HELMSTEAD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Oral argument held August 5, 2025. Opinion filed December 5, 2025. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Sierra M. Logan*, assistant district attorney, *Thomas Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., COBLE and BOLTON FLEMING, JJ.

PER CURIAM: After a traffic stop in which he was a backseat passenger, Cory Helmstead was convicted of felony possession of marijuana and two other misdemeanor crimes following a bench trial based on a stipulation of facts. He now appeals all three convictions, arguing there was insufficient evidence to support his convictions and that his pre- and post-*Miranda* statements taken at the scene of the traffic stop should be suppressed. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We find that Helmstead's pretrial stipulation precludes our review of his sufficiency arguments, and that his pre-*Miranda* statements were taken during an investigatory

1

detention, not a custodial interrogation, and as a result, the district court was correct to deny his motion to suppress. We affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2022, the State charged Helmstead with three criminal offenses: (1) felony possession of marijuana; (2) misdemeanor possession of drug paraphernalia, and (3) misdemeanor illegal transport of liquor. Before trial, Helmstead filed a motion to suppress his confession to owning the vape pen and attached cartridge found in the vehicle primarily because his statement occurred prior to him being *Mirandized*. He asserted that the law enforcement officer's interrogation of him was custodial and that a reasonable person would not have felt free to leave. Helmstead also argued that his post-*Miranda* statements, again admitting the ownership of the vape pen, should be suppressed because his coerced pre-*Miranda* statement tainted his post-*Miranda* statement. The district court held an evidentiary hearing on the motion to suppress and ultimately denied the motion, finding that Helmstead was not subject to custodial interrogation and made the statements voluntarily.

After the district court denied that motion, the parties agreed to a bench trial on stipulated facts based on the summary of the investigating officer's testimony, with Helmstead's renewal of his pretrial objection to the admission of his confession included in the stipulation. Before proceeding with the bench trial, the district court orally confirmed that Helmstead understood he was waiving his right to a jury trial and desired to have the case tried on the agreed facts.

The parties submitted the following stipulated facts:

"a.     On July 10, 2022, at approximately 01:10 AM, Reno County Sheriff Deputy M. Bohringer, while traveling eastbound on 30th Ave., near Apple Lane Rd., in

2

Hutchinson, Reno County, Kansas, he observed a vehicle approaching westbound 30th Ave. The vehicle's high beam headlights were activated and remained active while passing Deputy Bohringer's marked patrol vehicle.

"b.     Deputy Bohringer turned around to travel westbound 30th Ave. to initiate a traffic stop. The vehicle approached the flashing red traffic light at 30th Ave and Halstead Rd, the vehicle activated its brakes and came to a stop at the last moment, Deputy Bohringer was concerned that the vehicle was not going to stop at all. The vehicle continued west through the intersection; Deputy Bohringer activated his emergency lights. The vehicle failed to react appropriately and continued westward until finally coming to a stop on Rowland St, north of 30th Ave.

"c.     Deputy Bohringer made contact with the driver of the vehicle . . . . Based on observations of possible alcohol consumption, Deputy Bohringer conducted a DUI investigation involving [the driver]. Ultimately, [the driver] was arrested for driving under the influence of alcohol.

"d.     Deputy Bohringer then asked the two passengers to step out of the vehicle, to conduct a search incident to [the driver]'s arrest. The front seat passenger was identified as [the driver's] girlfriend. [The girlfriend] admitted that the two styrofoam cups found in the center console belonged to [the driver] and [herself]. She told Deputy Bohringer they were margarita drinks from Playa Azul, and that the drinks contained alcohol. [The girlfriend] was allowed to leave the scene.

"e.     The back seat passenger, identified as Cory Helmstead, knocked over an open can of Coors Light beer while exiting the vehicle. Additionally, Deputy Bohringer observed a second open can of Coor[s] Light in the seat back pocket of the driver seat where Helmstead was seated. On the floorboard of the backseat passenger area was an open case of Coors Light beer with approximately 20 unopened cans of Coors Light.

"f.     In the seat back pocket of the driver's seat, Deputy Bohringer located a black colored vape pen with a cartridge attached to the battery portion that contained a thick brown colored substance, that he believed was THC wax, based off the deputy's training and experience. While Deputy Bohringer was conducting his search, Helmstead stated the items in the back seat were his.

"g.     After concluding his search, Deputy Bohringer advised Helmstead of *Miranda* warnings, Helmstead stated he understood his right and agreed to waive that right

and continue speaking to Deputy Bohringer. Helmstead admitted the open Coors Light beer cans were his, along with the vape pen, and the attached cartridge contained THC wax. Helmstead was advised he would be long formed for possible charges and was free to leave the scene."

The parties also agreed on the admission of a forensic lab report from the Kansas Bureau of Investigation (KBI) showing that the substance in the vape pen cartridge tested positive for tetrahydrocannabinol (THC). The KBI report stated THC was detected in the cartridge but did not comment on the potency of the THC.

At the conclusion of the bench trial, the district court found Helmstead guilty beyond a reasonable doubt on all charges based upon the stipulated facts. The district court sentenced Helmstead to a total of 11 months in prison but suspended the execution of the sentence and awarded him 18 months of probation, including mandatory drug treatment.

Helmstead timely appeals.

ANALYSIS

Helmstead makes two overarching claims on appeal: first, that the evidence provided was insufficient to sustain any of the three convictions, and second, that the district court erred by denying his motion to suppress his pre-*Miranda*, and as follows, his post-*Miranda* statements. We address each argument in turn.

*Sufficiency of Evidence to Convict Helmstead*

Helmstead asserts a series of sufficiency of the evidence challenges to his three convictions. First, Helmstead argues the State failed to prove that he possessed marijuana because the stipulated facts showed only that he possessed THC. Second, because the

State only proved possession of THC and failed to prove the drug's potency exceeded the legal limit, he claims the State failed to prove that he possessed drug paraphernalia. Finally, he contends the evidence was insufficient for the State to disprove all the statutory exceptions for transporting an open container.

*Applicable legal principles*

Generally, when a party challenges the sufficiency of evidence, "we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

But when the case is decided on stipulated facts, as occurred here, the appellate court is in as good a position as the district court to examine and consider the evidence and to determine what the facts establish as a matter of law. *Weber v. Board of Marshall County Comm'rs*, 289 Kan. 1166, 1175-76, 221 P.3d 1094 (2009). So, when considering a sufficiency of evidence claim following a conviction based on a stipulation of facts, appellate courts exercise de novo review, viewing the facts in a light most favorable to the State. *State v. Scheuerman*, 314 Kan. 583, 587, 502 P.3d 502 (2022).

*If we are not precluded from reaching Helmstead's sufficiency arguments they are unpreserved.*

Helmstead asserts each of the three evidentiary challenges in his appellate brief as a separate issue. In his first challenge, Helmstead argues the stipulated facts only showed he possessed a vape pen containing THC. Distinguishing between marijuana and THC, he

5

solely relies on our court's unpublished opinion in *State v. Franklin*, No. 125,324, 2024 WL 3308183, at *4-7 (Kan. App. 2024) (unpublished opinion). There, in the appeal of a conviction by jury trial, this court found there was sufficient evidence to support the conviction of possession of marijuana, but the jury was instructed only on possession of THC. 2024 WL 3308183, at *1. Finding such a "'bait and switch'" tactic is prohibited and the possession of marijuana charge was impermissibly constructively amended, our court reversed Franklin's conviction for possession of marijuana. 2024 WL 3308183, at *5-6. Without delving too far into the merits of Helmstead's argument, we note the obvious— that *Franklin* dealt with the evidence before a jury, not with stipulated facts. This distinction here makes all the difference.

Second, while Helmstead concedes the vape pen, of which he admitted ownership, contained THC, he claims that evidence was still insufficient to convict him because the KBI report failed to show how much THC was present. Specifically, he argues that possession of THC under 0.3% concentration is not a crime under Kansas law and consequently, without additional proof, he could not be found guilty of possessing drug paraphernalia. See K.S.A. 2022 Supp. 21-5706(b)(7) (making it a crime to possess any substance denoted in K.S.A. 65-4105[h]); K.S.A. 2022 Supp. 65-4105(h)(1) (listing THC as a prohibited substance, but listing exceptions, including certain types of hemp as defined in K.S.A. 2-3901); and K.S.A. 2022 Supp. 2-3901(b)(7) (defining "'[i]ndustrial hemp'" as a variety of plant that contains "not more than 0.3%" of "delta-9" THC).

And, in his final evidentiary challenge, Helmstead claims the State failed to disprove all the exceptions listed in the statute criminalizing the transport of an open container of alcohol, found in K.S.A. 8-1599(b)(3). He argues that K.S.A. 8-1599(b)(3) allows passengers of a bus or a paid transportation service, such as an Uber, to carry an opened beer in the backseat, and the State failed to prove that he was not in such a vehicle.

6

But before we may reach the merits of Helmstead's sufficiency arguments, we must first address a fatal defect in his appeal. Both parties ignore or avoid a critical paragraph in their stipulation of facts specifically addressing the sufficiency of the evidence which reads: "The evidence in this case is sufficient for this Court to find [Helmstead] guilty as charged of possession of marijuana with 2 prior convictions, possession of drug paraphernalia, and illegal transportation of liquor."

When a party's strategic trial choice results in an adverse consequence, appellate courts have refused to grant relief on appeal from those same choices. *Lee v. Fischer*, 41 Kan. App. 2d 236, Syl. ¶ 3, 202 P.3d 57 (2009). Specifically, "[w]hen criminal defendants agree to stipulated facts without objection, they are precluded from arguing on appeal that the evidence was not sufficient to support the convictions if they conceded in the stipulation that the convictions were supported by sufficient evidence." *State v. McCammon*, 45 Kan. App. 2d 482, 488, 250 P.3d 838 (2011); see also *State v. Kramer*, No. 125,700, 2023 WL 8110080 (Kan. App. 2023) (unpublished opinion) (finding Kramer is precluded from challenging the sufficiency of evidence supporting her conviction because she stipulated to the facts supporting the charge), *rev. denied* 319 Kan. 835 (2024).

Here, Helmstead entered an agreement with the State to the stipulated facts. The most instrumental provision in the stipulation stated the evidence provided by the State was sufficient for the district court to find Helmstead guilty of all charges. No one challenged the district court when it declared that it would be making a determination based on the facts already presented to the court. Helmstead answered, "Yes, sir" when the district court asked if he was waiving his right to have the State present witnesses, cross-examine the witnesses, and call his own witnesses on his behalf. He also answered, "Yes, Your Honor" when asked if he desired to have the case tried on the stipulation of facts, and his attorney followed and answered the same. The district court found him guilty based on this stipulation.

Under these circumstances, we find that Helmstead has no right to complain on appeal that the evidence was insufficient to support his convictions. To permit him to do so would essentially ambush the district court.

Helmstead could argue that he should still be permitted to challenge the sufficiency of the evidence because the stipulation of facts included a provision that says he did not waive his "right to appeal the conviction." But when interpreting a contract— here, the stipulation—a provision should not be reviewed merely in isolation but by construing and considering the entire instrument from its four corners. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018). The law favors reasonable interpretation and reviewing courts should avoid results that create an absurdity in the terms which invalidates the purpose of the agreement. 308 Kan. at 936.

Also in the stipulation is a paragraph in which Helmstead "renews his objection to the admission of the testimony evidence" and the district court's ruling on his motion to suppress. This paragraph "specifically reserves" Helmstead's "right to appeal the Court's denial of his motion to suppress." This paragraph clarifies on what basis Helmstead is permitted to appeal his convictions. To read, then, that the later provision saves him from waiving his right to appeal the sufficiency of the evidence after allowing the district court to make its decision based on the stipulated facts would be absurd. A reasonable reading of the stipulation of facts would be that Helmstead preserved the right to appeal his convictions based on the denial of his motion to suppress, not based on the sufficiency of the evidence. To allow Helmstead to now challenge the evidence would be incongruous with the purpose of the agreement.

Additionally, Helmstead's counsel referenced during oral argument—not in his written briefing—that he could not have validly agreed to an error of law, relying on *State v. Stoll*, 312 Kan. 726, 735, 480 P.3d 158 (2021). But oral argument was his first mention of *Stoll*, and this amounts to a failure to brief the argument. *State v. Davis*, 313

8

Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.). But even if we were to review the *Stoll* decision, it is unhelpful to Helmstead's case.

In *Stoll*, the defendant had stipulated to a registration requirement under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., before being convicted of a registration violation—despite that her original sentence erroneously included that registration requirement. Our court found this stipulation, and the invited error doctrine, precluded her claim. The Kansas Supreme Court disagreed, finding that whether Stoll was required to register was a question of law and a party cannot concede an erroneous legal conclusion. 312 Kan. at 735.

But here, we find Helmstead's situation different. This is not a run-of-the-mill sufficiency of the evidence case, where we would examine sufficiency by viewing the evidence in the light most favorable to the State to decide whether a reasonable fact finder could have found him guilty beyond a reasonable doubt. See *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). Here, Helmstead is not raising a true *sufficiency* argument—he is making primarily legal arguments that he failed to preserve before the district court. It is a well-known legal maxim that issues not raised before the district court cannot be raised on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022).

Further distinguishing this case from the situation before the courts in *Stoll* is that Stoll's claim was purely a legal question of statutory interpretation—that is, a question of whether Stoll's prior conviction was a crime requiring registration. But Helmstead's question is not so clear cut. Here there was no testing of the evidence at trial due to the parties' stipulations of fact. Without the stipulation, there might have been additional testimony or evidence presented to support the State's case—but Helmstead's agreement that such other evidence was unnecessary allowed the district court to rely solely on the

9

parties' representations. To now decide the district court erred by relying on the parties' agreement would be patently unfair.

For these reasons, we decline to review Helmstead's sufficiency of the evidence challenges.

*The District Court Did Not Err by Denying Helmstead's Motion to Suppress*

The only remaining issue, then, is Helmstead's claim that the district court erred by denying his motion to suppress his statements. Helmstead argues that his acceptance of ownership of the vape pen and cartridge were made while he was being interrogated by law enforcement while in custody, and Deputy Bohringer failed to provide him a *Miranda* warning prior to his initial statement.

Helmstead claims that the district court erred in its determination that his pre-*Miranda* statements did not stem from a custodial interrogation. He asserts that a reasonable person under the circumstances would not have felt free to terminate or disengage from the encounter with law enforcement, and this suggests that the questioning was custodial. He claims that it follows, then, that his post-*Miranda* statements were also legally invalid because the sole purpose of Deputy Bohringer's post-*Miranda* questions was to cure the taint of the pre-*Miranda* admissions.

*Standard of review*

Appellate courts use a two-step standard when reviewing a decision on a motion to suppress a confession. First, the appellate court reviews the factual underpinnings of the ruling using a substantial competent evidence standard. Second, the appellate court considers the ultimate legal conclusion drawn from those facts de novo. The appellate court does not reweigh evidence, assess witness credibility, or resolve conflicting

10

evidence. *State v. Bentley*, 317 Kan. 222, 228, 526 P.3d 1060 (2023). When the significant facts are not in dispute, the decision to deny a suppression motion presents a question of law over which the appellate court has unlimited review. *State v. Guein*, 309 Kan. 1245, 1252, 444 P.3d 340 (2019).

*Helmstead's statements*

A review of the evidence before the district court is necessary to examine Helmstead's claim. In the parties' factual stipulation, the parties agreed that "[w]hile Deputy Bohringer was conducting his search, Helmstead stated the items in the backseat were his." Then, after finishing the search of the vehicle, "Deputy Bohringer advised Helmstead of *Miranda* warnings, Helmstead stated he understood his right and agreed to waive that right and continue speaking to Deputy Bohringer. Helmstead admitted the open Coors Light beer cans were his, along with the vape pen, and the attached cartridge contained THC wax." At this point, Deputy Bohringer told Helmstead "he would be long formed for possible charges and was free to leave the scene."

But the district court's suppression hearing occurred before the parties agreed to the factual stipulation. At that hearing, Deputy Bohringer was the sole witness and his body camera video was admitted as evidence. A thorough review of that evidence, as relevant to Helmstead, follows.

Twenty minutes into the traffic stop, the driver is placed under arrest for driving under the influence (DUI). Shortly thereafter, Deputy Bohringer asks Helmstead to exit the vehicle for his search incident to the driver's arrest and asks the other officers to get both passengers' names. Deputy Bohringer testified, and the video supports, that when Helmstead stepped out of the vehicle, there were two cans of beer both visible to Deputy Bohringer and within Helmstead's reach—a can of beer at Helmstead's feet and an open can of beer in the back pocket of the driver's seat where Helmstead sat in the backseat.

11

Deputy Bohringer alone began to search the car, taking photos of the interior. The deputy found the vape pen in the same back pocket of the front driver's side seat directly in front of where Helmstead was sitting. Deputy Bohringer testified that the vape pen had a cartridge attached that had a "brown waxy substance that [he] believed to be THC based off of" his experience with vape cartridges. At this time, the other officers were engaged with Helmstead and the girlfriend in congenial conversation while Deputy Bohringer continued his vehicle search.

As Deputy Bohringer removed a case of beer from the backseat and placed it on the hood of the car, Helmstead clearly volunteered, "Yeah, all that beer is mine, buddy." Deputy Bohringer picks up the vape pen and asks, "This yours, too?" Helmstead looked at the vape pen without answering, and when asked whether the item contained THC, Helmstead first responded, "I couldn't tell ya," and eventually said, "Looks like it." Deputy Bohringer again asked Helmstead if the vape was his, and Helmstead continued to stare at the item. When Deputy Bohringer asked again whether it was his, Helmstead shrugged. Deputy Bohringer told Helmstead that the vape pen was sitting with the beer next to Helmstead in the backseat, and Helmstead asked, "Was it? Okay," to which Deputy Bohringer responded, "uuh-huh" and then "fair enough?" Helmstead responded, "Yes, sir." Deputy Bohringer returned to searching the vehicle. This is the pre-*Miranda* statement of ownership on which Helmstead focuses.

After this exchange, the girlfriend completed a preliminary breath test that detected no alcohol in her system, and she asked if she was free to leave, motioning toward the subject vehicle, which belonged to her. Deputy Bohringer told her she was not free to leave, and although an explanation to her at that time is not evident on the video, Deputy Bohringer's testimony inferred that this was not because the girlfriend was being detained but because the vehicle search was not yet complete.

12

When Deputy Bohringer completed his vehicle search, including pouring the beer from the open cans retrieved from the car, he returned to his patrol vehicle to run the driver's information on his computer. After he exited his patrol vehicle, about four minutes after his initial discussion with Helmstead, he asked Helmstead to step aside with him. Deputy Bohringer asked Helmstead if anyone had "read [to him his] rights yet" and Helmstead responded, "No." At that time, the deputy read Helmstead the *Miranda* warnings.

Deputy Bohringer then confirmed with Helmstead that the beer was his, including the two open cans, and Helmstead agreed, explaining he had been "drinking all day" and the two discussed how long he had been drinking and the day's activities. The deputy then asked Helmstead about the "THC vape pen" and whether it was his, to which Helmstead nodded affirmatively and responded with "yes" or "yep." Deputy Bohringer asked Helmstead if he had ever been arrested for possession of marijuana before, and Helmstead responded, "I would rather not be again." When asked if he had any prior possession of marijuana convictions, he responded "I think but I can't recall," after which a discussion between the two ensued about prior convictions and how old Helmstead may have been. The deputy told Helmstead he would not be arrested at that time, but that the officer would be providing all information to the district attorney for that office's decision on how to pursue the case, mentioning the attorney would "long form" Helmstead.

> *A* Miranda *warning was not initially triggered because Helmstead was not in custody.*

Rather than the typical Fourth Amendment argument, Helmstead bases his argument on the officer's violation of his Fifth Amendment privilege against self-incrimination. Because of this, his argument hinges on whether he was in custody when he agreed to ownership of the incriminating items, which would trigger the *Miranda* warning.

Our Supreme Court in *Guein* examined a similar claim, distinguishing between Fourth and Fifth Amendment claims and outlining the legal principles applicable to each:

"[U]nder the Fourth Amendment, a person is protected from unreasonable searches and seizures. But the Fifth Amendment protects a person's privilege against self-incriminating statements.

"For purposes of a Fourth Amendment analysis, encounters between law enforcement officers and the public are generally classified under one of these categories: (1) consensual encounters; (2) investigatory detentions, also known as *Terry* stops; (3) public safety stops; and (4) arrests. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013). Relevant to this case, an investigatory detention or *Terry* stop allows an officer to detain any person in a public place if the officer reasonably suspects that the person is committing, has committed, or is about to commit a crime. K.S.A. 22-2402(1); see *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Although a person is seized when stopped by an officer and the freedom to walk away is restrained, a person can be seized without actually being under arrest. When a person is temporarily seized under *Terry*—but not under arrest—that encounter is an investigatory detention. *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006).

"By contrast, under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State shows it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. *State v. Schultz*, 289 Kan. 334, 340-41, 212 P.3d 150 (2009). As we said in *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 (2014):

'The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory

14

stage. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012); see *State v. Bridges*, 297 Kan. 989, 1002, 306 P.3d 244 (2013).'

"At the heart of the custody analysis, the court must ultimately determine as a matter of law whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (citing *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 [2012]); see *Thompson v. Keohane*, 516 U.S. 99, 113-14, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) ('[I]f encountered by a "reasonable person" would the identified circumstances add up to custody as defined by *Miranda*?')." *Guein*, 309 Kan. at 1253-54.

Roadside questioning during a routine traffic stop does not necessarily constitute a "'custodial interrogation'" for *Miranda* purposes. *Berkemer v. McCarty*, 468 U.S. 420, Syl. ¶ 2, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). This is because an ordinary traffic stop is quite different from the atmosphere of being interrogated at a law enforcement station, and most people understand that a traffic stop is normally brief and they will be free to leave once the stop is concluded. 468 U.S. at 437-39. As the *Berkemer* Court predicted, under this nuanced case-by-case rule, "the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody." 468 U.S. at 441. It is possible that an investigatory detention from a routine traffic stop can transform into a custodial interrogation under unusual circumstances. *State v. Vanek*, 39 Kan. App. 2d 529, 537, 180 P.3d 1087 (2008).

But additional factors showing that the person was "'in custody'" for practical purposes must be present to trigger the full panoply of protections under *Miranda*. *Berkemer*, 468 U.S. 436, Syl. ¶ 2. For instance, our Supreme Cout held that a person taken from a car at gunpoint, placed on the ground, and handcuffed was in custody for *Miranda* purposes. *State v. Payne*, 273 Kan. 466, 473, 478, 44 P.3d 419 (2002). Yet as the record shows, that was not the case here.

15

Our Supreme Court established eight factors to consider when determining whether an interrogation is investigative or custodial in nature: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officer or officers and the person being questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether police escorted the person being questioned to the interrogation location or the person arrived under the person's own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, and the factors do not bear equal weight. A court must analyze every situation on its own particular facts. *Guein*, 309 Kan. at 1254.

Relying on Deputy Bohringer's testimony from the suppression hearing, Helmstead argues that several factors weighed in favor of a custodial interrogation. For factor three, he claims multiple police officers—at least four—surrounded the driver's vehicle, and the patrol vehicles all had the emergency lights flashing. To support the fourth factor, Helmstead maintains that he was never told he was free to leave and was not free to leave once Deputy Bohringer initiated the search and found the open beer cans in the backseat. On factor six, he asserts Deputy Bohringer questioned him as a suspect, not a witness, because the deputy only questioned him about the vape pen and the cartridge. Addressing factor seven, Helmstead contends he had no choice but to be at the location of the traffic stop because he was a passenger in the car the police stopped. Finally, as for factor eight, Helmstead argues that although he was not arrested at the scene, Deputy Bohringer still submitted the case for prosecution.

Naturally, the State disagrees. The State argues the district court thoroughly reviewed the factors and properly found that Helmstead was not in custody during the questioning, and thus the *Miranda* warnings were not necessary. The State also insists

16

that Helmstead's statements, both pre- and post-*Miranda*, were voluntary and the district court was correct to deny his motion to suppress evidence.

On balance, we find Helmstead's analysis of the eight factors listed in *Guein* unpersuasive. Although Helmstead provides no argument on the first two factors, in the interest of thoroughness, we will examine each factor.

The first factor we examine is the place and time of the interrogation. Here, the interrogation took place roadside during a traffic stop. Although this traffic stop occurred in the early hours of the morning and in the dark, in contrast with the facts of *Guien*, here the area was not remote and was within the city, evidenced by the fact that the car sat through a traffic light before pulling over. See 309 Kan. at 1255 ("From the viewpoint of a reasonable person in Guein's position, the early morning hour, the darkness, and nearly deserted area would be considerations weighing toward custody."). As stated above, without additional evidence an ordinary traffic stop is not custodial for the purpose of *Miranda*.

Our second consideration is the duration of the interrogation. The entire traffic stop, from inception to the cordial parting handshake, lasted approximately 43 minutes according to Deputy Bohringer's body camera video footage. But during most of that time, Deputy Bohringer was investigating the driver's intoxication and resulting arrest for DUI and conducting a search of the vehicle incident to the arrest. Deputy Bohringer's interaction with Helmstead, from the time he exited the vehicle until he was read his *Miranda* rights, lasted only about 11 minutes. Although the officers did not clearly inform Helmstead that he was not required to answer questions, our Supreme Court has conceded this is not required. *Guein*, 309 Kan. at 1256. And, while the situation in *Guein* was described as short but "intense," with officers commanding that one of the individuals "come back here and talk to me," the situation here was not nearly so tense. 309 Kan. at 1257. Throughout the interactions, largely led by Deputy Bohringer, the

17

officers chatted amiably with all of the car's occupants about their day of bullfrog hunting. Helmstead's initial statement to Deputy Bohringer evidences the congenial nature of the encounter, with Helmstead entirely volunteering the beer was his, even concluding his statement with "buddy."

We next consider the number of law enforcement officers present. As already explained, there were four police patrol vehicles present with their lights flashing and at least two officers involved with the traffic stop. Deputy Bohringer testified and the video showed that due to multiple people in the vehicle he was stopping, he called for backup. Given that the officer was alone and verified multiple individuals inside the vehicle, it was reasonable for him to seek other officers for assistance. And unlike in *Guein*, where the officers approached the vehicle on opposite sides, placing the occupants between the officers in a show of force, here the responding back-up officers largely stood aside while Deputy Bohringer acted nearly as a single officer in a solo capacity.

This analysis carries over to the next factor—the conduct of the officers and the person being questioned. Again, although multiple officers were present, Deputy Bohringer was the primary law enforcement actor at all times. The cross-examination of Deputy Bohringer notes that the back-up officers were initially just "standing there watching." The other officers stood aside while occasionally assisting with the driver's field sobriety and breathalyzer tests, engaging Helmstead and the girlfriend in conversation during Deputy Bohringer's vehicle search, and one officer interacted with the girlfriend after she exited the car and asked to continue their driving with her in the driver's seat. Even so, Deputy Bohringer was always clearly in control of the entire stop. And while the deputy directed Helmstead to exit the vehicle, he calmly requested that he do so, to stand beside the girlfriend at the rear of the car, without force and without touching Helmstead.

18

This is in direct contrast to the conduct of the officers and suspect in *Guein*, where the officer patted Guein down after first requiring him to place his hands on his head. 309 Kan. at 1257. Compare *State v. Lewis*, 299 Kan. 828, 837, 326 P.3d 387 (2014) (defendant surrendering his car keys, cellphone, and wallet before the questioning was a circumstance weighing in favor of custody). As for Helmstead's conduct, as already noted, he volunteered ownership of the beer found in the vehicle while still standing at the rear of the vehicle, engaged in conversation with the other officers. Deputy Bohringer's investigation appeared to be calm and customary, and the other officers' restrained conduct was not out of the ordinary.

The fifth factor we consider is the presence or absence of actual physical restraint or its functional equivalent. One fact which, on its face, creates an initial question is that while conducting the search, Deputy Bohringer told the girlfriend that she was not free to go, within clear earshot of Helmstead. But as explained in his testimony, Deputy Bohringer was not detaining the girlfriend for any reason but needed to complete the search of the girlfriend's vehicle before she could take it and leave. She apparently could have walked away but could not have driven her vehicle, which she ostensibly—by motioning to her car—was requesting. This lessens the impact of her apparent lack of freedom on Helmstead's belief about his own freedom. The video shows Helmstead was not in any type of physical restraints and, considering the amiable conduct and conversation, he did not seem to be under duress at any time during the encounter. None of the officers had their firearms drawn, and again—unlike in *Guein*, Helmstead was not standing in a submissive position or being overtly watched by other officers, but was instead chatting with the officers. See 309 Kan. at 1257-58 (the officer directed another officer to "stand guard over the seated Guein"). Taken together, these facts lessen the impact of the girlfriend's apparent restraint on Helmstead's reasonable perception of his own restraint.

19

Our sixth consideration is whether Helmstead was questioned as a suspect or a witness. As the district court explained, this was a DUI investigation and Helmstead was, initially, likely only a potential witness. But once the officer viewed the open beer cans and the vape pen and attached cartridge near where he was seated, it would be reasonable to assume that Deputy Bohringer's question about the ownership of the items was with Helmstead in mind as a suspect. On the contrary, it could also be true that Deputy Bohringer asked Helmstead about the vape pen merely due to its location inside the vehicle, and since the vehicle clearly did not belong to Helmstead, to probe whether Helmstead knew to whom it belonged. The district court, weighing the evidence, found that Helmstead was being questioned as part of an investigatory detention. Because nothing in the record clearly shows otherwise, we refrain from reweighing the evidence or resolving conflicting evidence. *State v. Younger*, 320 Kan. 98, 115, 564 P.3d 744 (2025).

We must also consider, as the seventh factor, how the defendant arrived at the location—whether officers escorted him to the interrogation location or he arrived under his or her own power. Helmstead seems to argue that this factor favors him because he did not choose to be at the location of the investigation and only happened to be there as a passenger in the vehicle. He is correct that he did not choose to be subjected to a traffic stop and a DUI investigation. At the same time, he apparently willingly entered the vehicle with his open beer cans and vape pen, according to his admission. The officers did not force him to be there or bring him to the location of the investigation. Nothing in the record suggests otherwise. Moreover, as discussed above, Helmstead was not physically restrained, nor commanded to sit in a specific place or keep his hands above his head, for example—he was not directed to act in a certain way as a result of any overt show of authority. Compare *Guein*, 309 Kan. at 1258 (after Guein complied with the command to exit the car, the officer had him turn around and put his hands on his head); and *State v. Regelman*, 309 Kan. 52, 55, 60, 430 P.3d 946 (2018) (officers ordered the defendant to stop walking away and "'either sit on the steps or sit in my patrol car,'"

which subjected him "'to the functional equivalent of physical restraint since he had been denied freedom of movement and was ordered to return to his porch [steps]'").

Finally, we consider the result of the interrogation—whether officers allowed Helmstead to leave, further detained him, or arrested him following the interrogation. *Guein*, 309 Kan. at 1258. Helmstead claims this factor also favors him because although he was not arrested, he was ultimately prosecuted. But Helmstead was not arrested or taken into custody that night. In fact, after the search was complete, Deputy Bohringer told Helmstead and the girlfriend that they were free to go and Helmstead shared handshakes with all the officers. Nothing in the record shows that Helmstead was further restrained or was in custody during or immediately following the investigation. See *Lewis*, 299 Kan. at 837 (where after questioning, the defendant was questioned further, detained, and arrested, which all weighed in favor of a custodial interrogation).

After reviewing the body camera footage and Deputy Bohringer's testimony and analyzing the eight factors, the district court held that a *Miranda* warning was not necessary before Helmstead's initial statement of ownership because Helmstead was not in custody and the officer was "clearly involved in an investigatory interrogation" of Helmstead.

On our review, we similarly conclude that the facts applied to the eight factors do not support Helmstead's argument. The district court's factual findings were supported by substantial competent evidence, and on our de novo review of its legal conclusion, we agree that, although this may have been a close call, Helmstead was not in custody at the time of his initial statement. Of critical importance is the congenial nature of the interactions and the fact that Helmstead openly volunteered ownership of the beer during the officer's search of the vehicle, which directly preceded the officer's first question regarding ownership of the vape pen and cartridge. Helmstead was not subjected to an illegal custodial interrogation outside the vehicle, but was initially subjected to

21

investigatory questioning, which does not trigger the *Miranda* warnings. For these reasons, the district court was correct to deny Helmstead's motion to suppress his initial statements of ownership.

*Helmstead's post-*Miranda *statements were not legally invalid.*

Because the pre-*Miranda* statements were not obtained illegally, Helmstead's next argument that his pre-*Miranda* statements tainted the post-*Miranda* statements is unconvincing.

Helmstead argues this case is similar to *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). There, the police utilized a two-step interrogation technique to elicit inculpatory statements from Seibert and then provided her the *Miranda* warnings and subjected her to additional questioning based on her earlier confession. The *Siebert* Court held that police officers may not use pre-*Miranda* incriminating statements to elicit post-*Miranda* statements. *Seibert*, 542 U.S. at 614-17.

But *Seibert* is distinguishable because, as established above, Helmstead was not in custody during the first line of questioning by Deputy Bohringer and was not subject to an illegal custodial interrogation. As a result, because Deputy Bohringer's initial questioning of Helmstead was legally permissible, it could not have discredited the voluntariness of his *Miranda* waiver when the deputy continued to question him after reading him his rights. After Helmstead was provided the *Miranda* warnings, he affirmatively answered that the vape pen and attached cartridge belonged to him.

As a result, we find that the district court did not err by denying Helmstead's motion to suppress his pre- and post-*Miranda* statements.

Affirmed.

22